FLOWER VALLEY SHOPPING CENTER, INC., a joint venture, et al., Plaintiff-Appellants,

v.

ST. LOUIS COUNTY, Missouri, a body corporate and politic, et al., Defendants-Respondents.

No. 58615.

Supreme Court of Missouri, en banc.

Sept. 8, 1975.

Rehearing Denied Oct. 13, 1975.

Lewis, Rice, Tucker, Allen & Chubb by Arthur R. Tucker, Dominic Troiani, Kathianne Knaup, St. Louis, for appellants.

Thomas W. Wehrle, St. Louis County Counselor, Andrew J. Minardi, George F. Smith, Associate County Counselors, Clayton, for respondents.

DONNELLY, Judge.

Appellants Flower Valley Shopping Center, Inc., New Four Seasons, Inc., Capitol Land Company and Lee Center Shopper, Inc., are shopping centers located in the unincorporated area of St. Louis County. Each has a parking area in excess of 200,000 square feet. Appellants Ninety-nine Hundred Page Boulevard Corporation and Wood Decor, Inc., are lessees and tenants of Capitol Land Company in a shopping center having a parking area in excess of 200,000 square feet.

Appellants seek to invalidate St. Louis County Ordinance 6954 (1973), Chapter 624, Title VI, SLCRO (1964), known as the "Commercial Outside Security Code."

The ordinance requires that owners of shopping centers located in the unincorporated area of St. Louis County, and having parking area in excess of 200,000 square feet, provide outside security services for the protection and safety of shoppers. It designates various means of effectuating the purpose of the ordinance, ranging from foot patrols by licensed watchmen to electronic surveillance systems in combination with licensed watchmen. The licensed watchmen are to be privately employed by the owners of the shopping centers, but under the direction and supervision of the Superintendent of Police of St. Louis County. The ordinance purports to give such watchmen full powers of arrest and the use

of weapons. The ordinance also provides for penalties up to $1,000 for violations of the ordinance.

The trial court, without opinion, declared the ordinance valid, but granted appellants' motion to stay enforcement of the ordinance pending appeal.

As we view the case, the determinative question is whether St. Louis County may impose upon the owners and tenants of shopping centers the duty of providing police protection for the visiting public. In answering this question it is first necessary to distinguish the issue of the constitutionality of the ordinance, which refers to the reasonableness of the exercise of the County's police power, and the issue of authority under the County charter to enact such legislation in this area of the law. In other words, an ordinance may well meet the constitutional standard of reasonableness, and yet be invalid because a county or city has not been granted the power and authority to enact such legislation. We feel this is the situation in the present case.

We have found no law bearing directly on the question. However, we have found decisions and statutes relating indirectly to the problem.

In *City of Hartford v. Parsons*, 87 Conn. 412, 87 A. 736 (1913), a city ordinance required theater managers to have in attendance at every performance a member of either the city police force or the fire department to supervise fire escapes and exits. The Court declared that it had no doubt that the City of Hartford had authority, under its police power, to enact the ordinance in question and require the various theater managers to pay for the services rendered.

The case of *Tannenbaum v. Rehm*, 152 Ala. 494, 44 So. 532 (1907), involved an ordinance of the City of Mobile whereby the mayor, at the request of the theater manager, could detail up to four policemen at a theater to preserve order. More importantly, the ordinance provided that the chief of the fire department shall assign one fireman to all theater performances to prevent and extinguish fires. The ordinance further provided that the cost of both the police and fire protection was to be paid by the theater manager. The Court concluded ". . . that the ordinance in question was clearly within the police power of the municipality, and that it is not unreasonable." 152 Ala. at 498, 44 So. at 533.

Similarly, in *American Baseball Club of Philadelphia v. City of Philadelphia*, 312 Pa. 311, 167 A. 891 (1933), a city ordinance required persons holding athletic contests or exhibitions at which an admission fee was charged to pay a license fee in an amount based on a reasonable estimate of the number of policemen or firemen needed to protect the public safety at such events. The Court found this ordinance to be reasonable and within the police power of the city, saying:

"Where admission is charged, the maintenance of the exhibition or contest is in the nature of a business for profit, while in the case where no admission is charged there is present no suggestion of business. It is not without reason that, where a profit is expected, and the whole purpose of the exhibition is to produce a profit, the city authorities should conclude that it is improper to require the public to contribute to the success of the business to a greater extent than is necessary in the conduct of other businesses. It does not appear as unreasonable that the municipal authorities should require those who demand special services from it in order to conduct their businesses at a profit to pay for the additional services, and not burden other citizens of the municipality with the cost of such services.

"Complaint is made that appellees are taxpayers, and as such they are entitled to these services. In answer, we may say it is true the city is obligated to render services to all taxpayers, but, where that service is worked into the success of their business so that they may make a profit, a different question arises. There is a

vast distinction between great public buildings which house thousands, great department stores where thousands visit daily, great industrial plants where tens of thousands are employed, who at noon and evening hours discharge on the public streets tens of thousands who need no extra police supervision, and an athletic contest such as a baseball game which imposes on the city an extraordinary expense. In brief, the city should not be required to help defray the operating costs of a business of this kind." 167 A. at 894.

A similar issue of corporate power and authority was presented in *Waters v. Leech*, 3 Ark. 110 (1840), wherein an ordinance of the City of Little Rock required the city constable to attend every circus, show, menagerie, theater or exhibition performed in the city in order to preserve the peace, and imposed a fee on the proprietor for such service in the sum of $2.50 per night. The Court scrutinized the city charter, noting provisions relating to the maintenance and promotion of "good order and government." The Court also discussed the nature of corporate powers in that they ". . . are not only limited, but must be reasonably exercised in sound discretion, and not only strictly within the limits of the charter, but in perfect subordination to the constitution and the general law of land, and the rights dependent thereon; and that power, if properly exercised, may be enforced by just and competent penalties." 3 Ark. at 115.

The Court found the imposition of the service fee not within the power of the city. The Court reasoned that "[i]f the principle is admitted that under the general power of providing by ordinances and bylaws for the preservation of good order within the limits of the city, the corporation can do this, where, we would inquire, is the limit to their authority? They may, with the same propriety, make his duty extend to standing guard over dramshops and drinking establishments, and at the stores of the citizens, thereby rendering those laws and ordinances oppressive and injurious, under the specious pretense of suppressing riot or tumult which might or might not take place." 3 Ark. at 117.

In *City of Chicago v. Weber et al.*, 246 Ill. 304, 92 N.E. 859 (1910), an ordinance required theater owners to employ a regular city fireman, approved by the fire marshal and subject to his command at every theater performance. The cost of such service was to be borne by the proprietor. The Court concluded the Legislature had not empowered the city to pass such an ordinance, and further found it unnecessary to decide whether the Legislature could authorize the passage of such an ordinance, and whether it would be constitutional if duly authorized. The Court reasoned as follows:

"It is undoubtedly true that provisions for the safety of the public come within the police power, as has been frequently held with reference to crossings over railways (*Chicago & Northwestern Railway Co. v. City of Chicago*, 140 Ill. 309, 29 N.E. 1109), and the safety of the public attending theaters in large numbers would be promoted by the attendance of a member of the fire department and the performance of the duties imposed upon him by the ordinance. That, however, does not determine the question of the right to require a theater owner to pay for such services rendered to the public. Counsel for the city regard the question as merely one of classification as between owners of theaters and owners of other buildings, and insist that there are material differences between theaters and other buildings where there are large numbers of people, so that the classification is founded on substantial differences. That is not the whole question. The Legislature have the same authority over the business of conducting the theater as any other lawful business and no more (*People v. Steele*, 231 Ill. 340, 83 N.E. 236, 14 L.R.A.[N.S.] 361, 121 Am.St.Rep. 321), and if the city cannot impose a burden like the one in question upon private owners it is immaterial whether it can

classify owners or not. There are differences between theaters and some other places where there are large numbers of people exposed to the dangers of fire, consisting in the fact of their being seated and the liability to a panic with the dangerous consequences; but whether there is any perceptible difference between theaters, assembly halls, and churches where practically equal numbers gather and are seated is not so clear. * * * There are other buildings in the city where there are great numbers of people which are distinguished in some respects from theaters. There are department stores in which the number of clerks and employes range from 2,000 to 4,000 in dull seasons and reach 6,000 in busy times and in which there are from 5,000 to 10,000 people at one time. These buildings are filled with inflammable material and without the exits required in theaters. * * * The illustration given with respect to other buildings is not for the purpose of demonstrating that there is no ground for classification as between theaters and other buildings, but for the purpose of making it clear that there are other buildings and property owners which might be subjected to the same requirement if the power exists. In every building in the city where large numbers of people are employed or where the public go in crowds, the safety of those in the building would be promoted by having a member of the fire department there, and, if the discharge of the duty to the public who attend theaters may be charged to the owner, the same requirement may be made of the owner of every other building where the public are invited or attend in numbers. The city has power to establish a fire department, to erect engine houses, and provide fire engines and other implements for the prevention and extinguishment of fires; but that duty is a duty to the public. If there is power to charge the expenses of performing that public duty to the owner of a theater, there is also power to do the same thing with respect to other owners, and the members of the fire department could be parceled out and stationed in private buildings, so that practically the whole expense of the fire department would be paid by individuals or corporations. If the city has authority to do that, it could accomplish the same result with policemen, who are in the direct exercise of the police power, and they might be stationed in every building where disorder or violation of the law might occur and the expense be charged to the owner. That the city cannot perform its duties to the public in that way is manifest." ' 92 N.E. at 861–862.

 In the present case, the primary thrust of appellants' argument questions the *constitutionality* of the ordinance. The general law in Missouri on this question was stated in *Bellerive Investment Co. v. Kansas City*, 321 Mo. 969, 981, 13 S.W.2d 628, 634 (1929), as follows:

"It has been definitely and clearly established and settled, by the decisions of this court and of the federal Supreme Court, that a statute, or a municipal ordinance, which is fairly referable to the police power of the State or municipality, and which discloses upon its face, or which may be shown aliunde, to have been enacted for the protection, and in furtherance, of the peace, comfort, safety, health, morality, and general welfare of the inhabitants of the State or municipality, does not contravene or infringe the several sections of the state and federal Constitutions invoked by the appellants herein, and cannot be held invalid as wrongfully depriving the appellants of any right or privilege guaranteed by the Constitution, state or federal; the reason and basis underlying such decisions being that the personal and property rights of the individual are subservient and subordinate to the general welfare of society, and of the community at large, and that a statute or ordinance which is fairly referable to the police power has for its

object the 'greatest good of the greatest number.' "

■ We believe the ordinance would represent a reasonable exercise of the police power under the law stated in *Bellerive*, supra, if authorized by the Constitution or by statute. See 4 D.C.Code § 115; 23 D.C. Code § 582(a); 31 V.S.A. § 620; *Chung Mee Restaurant Co. v. Healy*, 86 N.H. 483, 171 A. 263 (1934).

■ However, we have concluded that St. Louis County is without *authority* to enact the ordinance. We recognize that Article VI, § 18(b) of the Constitution, "in authorizing the adoption of home rule charters, * * * carries with it an implied grant of such powers as are reasonably necessary to the exercise of the powers granted * * *." *Hellman v. St. Louis County*, 302 S.W.2d 911, 916 (Mo.1957). But, a charter or ordinance enacted under § 18(b), may not "invade the province of general legislation" involving the public policy of the state as a whole. *State ex rel. Spink v. Kemp*, 283 S.W.2d 502, 514 (Mo. banc 1955). In *State ex rel. St. Louis County v. Kirkpatrick*, 426 S.W.2d 72, 74 (Mo. 1968), the question was whether the County had the authority to enact an ordinance submitting to the voters a proposal calling for the nonpartisan selection in the County of certain judges. This Court held that the County was without such authority and that "[e]ven though St. Louis County under its charter must perform certain state functions over the entire county, * * * it is not within the constitutional power granted the county to provide for the manner of selection of * * * judges, * * *." In our opinion, the question whether owners of private property may be compelled to provide police protection for shoppers is also one of state-wide concern and may not be addressed by counties without constitutional or statutory authority more explicit than is found in Art. VI, § 18(b).

The judgment is reversed and remanded with directions to proceed in a manner consistent with this opinion.

MORGAN, HOLMAN, BARDGETT, HENLEY and FINCH, JJ., concur.

SEILER, C. J., concurs in separate concurring opinion filed.

SEILER, Chief Justice (concurring).

I concur in the principal opinion, but would emphasize that under the provisions of Art. VI, Sec. 18, Mo. Const., county charters are instruments which grant power and I take what is said in the principal opinion to be said with that in mind. We are not dealing here with a charter which is an instrument to limit power, as is now true of charters for charter cities under the constitutional amendments adopted in 1971 to Art. VI, Secs. 19 and 19(a) as I understand them. A charter city has the power, provided it is consistent with the Constitution and not denied by the charter or by statute.